STATE v. WHITE.

(Filed May 23, 1905.)

*Homicide—Evidence—Harmless  Error—Manslaughter.*

1.  In an indictment for murder, it was error to exclude the testimony of one of the prisoners that his brother, the other prisoner, asked the witness to go with him to the home of deceased to help him persuade deceased to marry their neice, and that the witness informed his brother he would go with him for that purpose, and there was no agreement or conspiracy to use force or violence, if deceased declined.

2.  Neither the rejection of competent evidence nor the withdrawal of the question of manslaughter from the consideration of the jury is reversible error, where in considering the entire testimony, including that rejected, and accepting the statements of the prisoners as true, there is no aspect of the case that would justify a verdict of a lesser crime than murder in the second degree, of which the prisoners were convicted.

STATE *v.* WHITE.

3.  The doctrine that when men fight upon a sudden quarrel and one
    kills the other in the heat of passion aroused by the combat,
    the law considers the killing a case of manslaughter, has this
    limitation—that the combatants must fight on equal terms, at
    least at the outset, and no unfair advantage must be taken.

4.  Intentional killing is manslaughter where the act is committed
    under and by reason of a passion caused by provocation which
    the law deems adequate to excite uncontrollable passion in the
    mind of a reasonable man.

5.  In an indictment for murder against two brothers, where it ap-
    peared that they had a common purpose in going to the house
    of the deceased and though they may have gone without any pur-
    pose to kill or do unlawful violence; yet when they drew
    their weapons they entered on that purpose unlawfully, and were
    so manifestly acting together, one in aid of the other, that a
    killing by either, under the facts of this case, would inculpate
    both.

INDICTMENT for murder against Thomas J. White and
Chalmers L. White, heard by *Judge C. M. Cooke* and a jury,
at September Term, 1904, of the Superior Court of ROWAN
County.

The eye witnesses to the transaction were Mrs. A. E. Sher-
rill, mother of deceased, and the prisoners, Thomas J. White
and Chalmers L. White, and their direct testimony is here
set out.

Mrs. Sherrill, mother of deceased, testified for the State:
"Chal. and Tom White came there very early in the morning
before I got up; it was before sun up; they came from the
south; I did not see them come, but they hitched their horses
on the south side of the railroad that goes in south; they were
in a two-horse buggy, driving two horses; I did not know
them when I went to the door; I had seen them often, but as
I say I did not know them. The prisoners came up from
the left side of the house on the west, I might say, of the
front side; they hitched their horses to a post, I suppose;
can't say whether they were hitched or not. This post was

138——45

about 50 yards or a little further from the house or porch; the porch is on the north side of the house; its width I do not know; I have never measured it; its length is about twelve or fifteen feet, I guess; I do not know; it is an old-fashioned piazza, with wide door and latticed around. On the morning of September 17, I was in my room and heard some one knock at the front door. I stepped in the front room to the window and called to them that I would be down in a few minutes. I stepped back and dressed, opened the door and saw two strangers; they said to me, 'we want to see Russell;' I said he was asleep and then they asked me to tell him to come down; said they didn't want to see me, and to tell him some gentlemen wanted to see him. Russell said, 'who is it?' and I said, 'I don't know, they are strangers; come down.' I went down myself and stepped into the back hall on the front porch and stood there until Russell came down; when he came down I stepped back and stood about midway the door. They said to me, 'you stay back, and we will see you later.' I did not do it; I stepped immediately to the front door near my son. Two pistols were drawn on my son in this way (indicating pistol pointing on each side). They then said, 'we are Tom and Chal. White; you are aware you have ruined our niece, Annie White, and we have come to make you marry her, or we will kill you before you leave our sight.' Russell said, 'I did not ruin her; I was not the first one there.' They said, 'you did ruin her, and you will marry her or we will kill you before you leave our sight.' I stepped between them and begged them not to kill my son. I told them if they could not spare him for his own sake, then for mine at least. I turned to the brothers and they said, one of them, 'I am deaf,' and then one said, 'you go back, we will see you later.' I stepped inside the door and they again said, 'you go back or we will kill you.' And my son said, 'go,' and I said 'I will go.' The deaf man followed my son and kept him from going into the door. They said, 'you will go with us,' and

Russell said, 'I do not love her, and I cannot do it.' Two pistols fired immediately, and he fell. He fell straight back with his head towards the west, towards the bench that he had been sitting on. Yes, when I went to the door he was seated on the bench. That bench was right along on the west side of the porch, and he was seated here (indicating) on the bench at the west end of the porch. The bench was about five feet long. He was about midway the bench, about the middle of the porch. The bench was sitting one end back against the lattice. They were talking to me then—both pistols drawn on Russell. That's when they said, 'you go back, we will see you later.' They were still talking to him. When he was shot I do not know whether I fell or sank down, or what I did. I must have gotten up and went to my son to see if he was dead, and spoke to him, and he did not give me any answer. I thought he was dead and went immediately into the walkway of the yard. These two men just stepped off after they had killed him. My son, when he was shot, got up and came to the door and would have come in but they kept him from coming and pushed him a little to one side, and I saw his hand go up before his face. My son did not have a thing in his hand, not a thing; he threw up one hand; I saw only one hand. Two shots were fired right together and then a third one; I do not know whether both men shot or not; there were two shots though, right together, and then a third. My son was hit in the back of the head and in the face. One man was on each side of my son when he was sitting down and when he was standing. They had their pistols then."

(Mrs. Sherrill then described the position of her son and the two White boys. One thing in particular the reporter caught was the close proximity of the White boys to Russell Sherrill, that is to say, they pressed him closely on each side, as Mrs. Sherrill went on to show. She demonstrated how his retreat was cut off from the door, pistols in hand.)

"My son stepped out towards the deaf man, and he turned then to the left to pass the tall man.  Chal. White moved forward to the right.  (Mrs. Sherrill here again takes up the position of the men.)  Russell fell to the left toward the bench, 'caticorner,' not so much so however.  When these men first came my son was in bed and I told him to get up; he came down in a very few minutes; did not more than half dress himself; he just had on his pants and dress shirt and shoes; his shoes were ties, but not tied at the time, and he had a hat on his head."

Q.  Now, Mrs. Sherrill, Chal. White testified that you came out on the porch, took a seat and said you wanted to talk the matter over; that you were sorry this had come about; that you had tried to raise the family better.  Did you say that?  A.  I did not say that.

Q.  Did you sit down?  A.  I did not.

Q.  State whether or not at the time your son was shot, he was making any attack upon either of the prisoners.  A. He was not; he had his hand up to ward off the pistol.

Q.  Did Thomas White touch you on the shoulder, as he testified he did  *  *  *  ?  A.  He did not.

The prisoners testified that having heard that their niece had been ruined by the deceased, they went to the home of Mrs. Sherrill, where deceased lived, with a view and purpose of inducing him to marry their niece, and save the families the disgrace; that they each had a pistol, but there was no conspiracy between them to kill the deceased, and no intention of doing so, but thought they could persuade the deceased to marry the girl.  Chalmers White testified in behalf of himself and co-prisoner: "When I left my sister-in-law's, I started early in order that we might find him at home before he would leave.  I had information of his probable leaving, and I had another reason for wanting to go early.  I wanted it kept as quiet as possible until it was over.  It was not more than three-quarters of a mile, possibly a mile, but I do not

think over three-quarters. I arrived there, I think, about six in the morning. It was a dark, cloudy morning—a fog, and a very dark morning. We hitched our horses out in front of the porch or out from the house to a hitching post, and then went to the house and knocked; walked upon the piazza and knocked upon the door. A lady then answered it. My brother took part in the conversation down to my sister-in-law's; he talked, but not as much as I did, and not as long; but he talked with her; Mrs. Sherrill came to the door and I told her good morning, and asked if Russell Sherrill was at home; she said, 'yes.' I told her I would like to see him on some business; she handed us two chairs; we sat down and waited till he came; presently he came down, his mother with him. I spoke to him and introduced myself and my brother; we both shook hands with him and I told him we wanted to see him on some business privately. He then said to his mother, 'you go back into the house,' which she did. She walked back into the hall, and he stepped back and closed the door. He then walked out on the piazza to the front end of the porch and sat down on the bench; we walked up near him, around him, in front of him. I said to him, 'Mr. Sherrill, you are aware of the fact that we came here to make you keep your promise.' He replied, 'I did not do it.' I said, 'you must marry her,' and he said, 'I cannot, I do not love her.' And I said, 'you can't get out of it that way.' He said, 'I will fix it up, but I will not marry her, I will die first,' and sprang to his feet in an angry, threatening attitude. I stepped back and drew a pistol. He said, 'I will marry her,' and I said, 'I am glad of it.' Mrs. Sherrill heard a part of the conversation and came out into the hall. She said, 'what is the trouble?'—'don't kill my boy,' and I said 'he has ruined our niece, Annie White, and we have come up to get him to marry her.' She said, 'well, do not kill my boy,' and I said, 'I do not want to kill him.' She said, 'let's talk the matter over and save shame and disgrace.' I told her I would. She

sat down on a chair just back of us, and said she was sorry her family had come to this; that she had tried to raise the boy better. I then turned and walked back to where Mr. Sherrill*was and told him to come on and go with us. He then seemed very angry, began to advance and then said, 'I will die first,' and as he said that he sprang towards us, or forward, and I shot him. My brother fired at him about the same time. I do not know who shot first, we shot nearly at the same time. As he started towards me, Mrs. Sherrill ran from the porch into the hall, screaming at the top of her voice, and as she fell to the floor, we walked off; she was not inside when we fired; she screamed and ran into the hall. He was very close to me, and I think just a little, possibly, to the center of the door; he was very close to me. I thought he was going to strike me with something when he advanced; he was in a striking attitude and in an angry frame of mind. I think he was going to strike me because he was rushing on me, and I thought I saw something. He could see that I was armed, and I thought he was armed, and I did not think he would attack me unless he was. I could not see the knife in his hand; he could have held a knife or something I could not see; it was a dark, cloudy morning, a very dark, foggy morning. I went there with no purpose or idea of killing, him, no intention whatever; it was only to get him to marry the girl and save shame and disgrace. I never saw him before. My brother and I had never at any time talked about killing him. I did not know I had hit him. I knew I had shot, but did not know I had hit him. When he started at me, I retreated a step, from time to time, when he started back towards the further end of the porch from where my brother was when he sprang forward; this threw my brother behind him; my brother had been to the left; and this threw my brother almost diagonally between us." The prisoners show on the map what they mean. "When he sprang up he said something to my brother, and he said for him to talk to me,

that he could not hear. (Further description as to porch and position of men.) The three of us would have made a triangle or three sides of a triangle. He rushed on me with his arm drawn back, when I fired, as if to strike, just this way (witness shows striking position of right hand and arm drawn back as if to deliver a blow.) I left there; went to my buggy. I did not anticipate any trouble. I took the pistol in case I would need it to protect myself against any one and any danger; was not going up looking for trouble, no, not even with Sherrill. I carried the pistol though. I would rather have a pistol through the country."

Q. So you expected trouble, did you? A. I did not know what I would find, I did not know how it might terminate.

Q. So you took him along to help kill this man if he didn't marry your niece, is that it? A. I didn't take him; he went because we were going on a dangerous mission.

Q. And you expected trouble, eh? A. No, but I didn't know the man, and didn't know how it would end.

"From the time we struck that porch until the time he came down, I presume the whole time would be about four or five minutes before he was lying on his back on the floor, dead. It was not my intention to kill him; he didn't give us the opportunity to hear his refusal and go back to Mrs. Archer's quietly. I knew my brother had a pistol; he borrowed it. I do not know where he borrowed it; in Concord, I guess. He sprang to his feet and we drew our pistols; the pistols were not pointing in his face, pointing at him though, I suppose; my brother's was pointing at him too."

By the State: Q. Did you see anything in his hand? A. I could not tell what he had in his hand.

Q. Did you see the knife? A. He had his hand drawn back this way (striking attitude), drawn back as though to strike. I could not see what was in his hand.

Q. Was there anything in his hand? You say you could distinguish Mrs. Sherrill was a lady when she came to the

door.  Now, if he had had a knife why couldn't you have
seen that?  I say, why couldn't you?  A. I did not know
what he had in his hand; I thought there was something in
his hand; I could not tell what it was.

Re-direct: "My testimony was interrupted very much by
counsel on both sides at the preliminary hearing, and I could
not give the testimony as fully as I wanted to.  I never had
any difficulty in my life before; yes, I stated a while
ago, I thought I shot twice; I ascertained I did not after the
pistols had been examined and brought to the attorney's office.
That was the day of the preliminary hearing; the pistols
were examined and my pistol showed I shot only once; my
brother shot twice, as his pistol showed.  I did say a while
ago we did not want to kill him, and because that would have
made matters more public, worse, and the shame would have
gone further.  I had no intention of killing him."

Thomas White's testimony in behalf of himself and co-
prisoner (he is deaf) : "I can hear through a trumpet in
my right ear, but not as well as I can in the other.  It was
about six when we got to Mrs. Sherrill's house.  It was day-
light; the morning was cloudy and threatening rain.  The
first thing after arriving we tied our horses (two horses and
a top buggy) to a hitching post about 40 or 50 yards off.  We
went up to the house and my brother knocked at the door;
soon after he knocked, Mrs. Sherrill responded; when she
came to the door a conversation took place between her and
my brother.  I knew Mrs. Sherrill, and did not see why she
did not know me.  I did not hear the conversation after Mrs.
Sherrill came to the door; she set out two chairs; my brother
took one and I took the other, occupying opposite sides of
the piazza.  I said to my brother in a low tone, after she had
gone back in the house, 'is he at home?'  He nodded assent.
In a short time after that Russell Sherrill came down on the
piazza; my brother spoke to him, shook hands with him, in-
troduced him to me and I shook hands.  I had seen him, but

was not personally acquainted with him. After he came out, Mrs. Sherrill also came out,. and a conversation took place between them. Sherrill said something to his mother and she went back into the hall. Sherrill followed her and closed the hall door; he closed the inner door, then came back and sat down on the bench at the end of the piazza; my brother then went to him, and again the conversation began; in a few minutes after the conversation he sprang to his feet and assumed a threatening attitude. At that time my brother drew his pistol and stepped back one step. I did not know what had passed; I was just judging from my brother's actions; then almost immediately after that, just after the pistols were drawn, Mrs. Sherrill came out of the hall and a conversation took place between her and my brother. We were all sitting down at the beginning, but at the time Mrs. Sherrill came out we were all standing, and then the conversation took place between her and my brother; Mrs. Sherrill turned to me and I said, 'talk to my brother, I cannot hear you,' and just at that moment she stepped between us and I touched her on the arm or shoulder and told her not to come between us; this seemed to infuriate Sherrill, from his actions and expression of his face. He was directing his conversation to me after I touched his mother on the shoulder. It seemed as if I had angered him very much. I said, 'talk to my brother, I cannot hear you.' I then asked my brother if Sherrill would marry her, and he said he would; then I said to Sherrill, 'come and go in the buggy.' Mrs. Sherrill had stepped back a few paces and was near the hall door. The next thing, Sherrill advanced very rapidly on my brother, my brother retreated, and I kept in line with Sherrill, and after passing just beyond the door, half way, he drew back as if to strike. I saw his hand fly up; I did not see a blade was in it, my pistol was not drawn, I drew and fired, my brother fired just the instant I did; I think my brother shot just the moment before I did. Sherrill fell diagonally with his head towards

the end of the porch; at the moment he fell my brother
walked around. We went out, loosed the horses, and I said,
'let's go and surrender at once,' and he said 'let's go back
and tell Jennie what has happened.' My object in going was
to induce him to marry my niece and save disgrace, not to
themselves, but to all concerned."

The prisoners appealed from a judgment pronounced upon
the verdict of guilty of murder in the second degree.

*Robert D. Gilmer, Attorney-General, L. II. Clement, T. C.
Linn* and *B. B. Miller,* for the State.

*Montgomery & Crowell, Overman & Gregory, T. F. Klutz,
R. L. Wright* and *C. B. Watson* for the prisoners.

HOKE, J., after stating the facts: The above statement
gives the direct evidence of all the living persons who saw the
occurrence, and presents the case sufficiently to a proper un-
derstanding of the court's decision.

In developing their case before the jury, the prisoners pro-
posed to prove by the witness, White, one of the prisoners,
that his brother, the other prisoner, asked the witness to go
with him to Sherrill's to help him persuade Sherrill to marry
the witness's niece, and that the witness informed his brother
he would go with him for that purpose, and there was no
agreement or conspiracy to use force or violence on Sherrill
if he declined. To this testimony the State objected. The
objection was sustained and the prisoners excepted.

We are of opinion that this ruling was erroneous and the
evidence should have been received. The argument to sus-
tain the objection was put on the ground that the proposed
testimony was a mere declaration of the prisoner in his own
favor, and as such was incompetent. This was no declaration
of the prisoner, but his sworn statement in a matter relevant
to the issue. The purpose of the prisoner in going to the
home of the deceased, in some aspects of the case, was very

pertinent, and the prisoner's testimony of such purpose was relevant as substantive testimony and the declaration to his brother was relevant as corroborative evidence. *State v. Hall,* 132 N. C., 1102. Again, while the judge below in one portion of the charge submitted the question of manslaughter to the jury, in closing the charge he said: "You will consider and determine upon consideration of all the evidence in this case, and applying the principles of the law as instructed, whether or not the prisoners or either of them is guilty of murder in the first or murder in the second degree." This was no doubt an inadvertence on the part of the court, but the effect, we think, was to withdraw from the jury the question of manslaughter. The prisoners excepted. Where there is evidence admitting a consideration of manslaughter on an indictment of this kind and facts of this character, the prisoners are entitled to have the same submitted under a correct charge, and the failure to do so would be error, because, though the verdict may be for a higher offense, the jury might have convicted of the lower crime, if the same had been submitted under a proper charge. We do not think, however, that either of these exceptions presents a case of reversible error, because, assuming the rejected evidence to be true, that in going to the home of the deceased, there was no conspiracy to do violence, and that they only went to persuade the deceased to marry their niece, we are of opinion that in considering the entire testimony, including that rejected, and accepting the statements of the prisoners as true, there is no aspect of the case that would justify a verdict of a lesser crime than murder in the second degree. Of this the prisoners were convicted, and the error of withdrawing the question of manslaughter from the consideration of the jury was immaterial. The question of murder in the first degree not being before us, and an intentional homicide having been admitted by the prisoners on the evidence in this case, the law presumes the killing to be murder in the second

degree, and it must be so declared, unless from the entire testimony the prisoners satisfy the jury that the killing was excusable on the plan of self-defense, or of facts which mitigate the crime to manslaughter. *State v. Smith,* 77 N. C., 488. In that case, *Faircloth, J.,* speaking for the court, says: "Homicide is murder unless it be attended with extenuating circumstances which must appear to the satisfaction of the jury. If A assaults B, giving him a severe blow or otherwise making the provocation great, and B strikes him with a deadly weapon and death ensues, the law in deference to human passion says this is manslaughter;" and the case further states if the "provocation be slight and it can be collected from the weapon used or any other circumstances that the prisoner intended to kill or do great bodily harm and death follows, it is murder." Foster's Crown Law, 291. It cannot be contended here that this is a case of excusable homicide. Two strong, vigorous and determined men, in the presence of a boy just grown, called him from his bed about daylight in the morning, without arms or means of defense. They were near enough to have seized the deceased at any time during the difficulty, and could have easily overpowered him. The killing was without necessity, and there is no statement or claim by the prisoners that they or either of them were in reasonable apprehension of bodily harm at any time.

Thomas White's evidence:

Q. You shot him in the back of the head when you could have caught and held him? A. I could have caught him.

Q. You say you did not want to hurt him; then why didn't you catch him and keep from hurting him—two great large men like you were? A. Because he attacked us.

Q. You were mad then? A. No, not mad.

Q. Not mad, and yet you preferred to shoot him in the back of the head instead of holding him? A. I shot him be-

cause of the fight on hand. My brother was not struck at all; neither of us hit.

Q. And yet you shot and killed young Sherrill? A. Yes, I shot once, and I do not know how many times my brother shot.

Nor is there any well considered principle of manslaughter to which the conduct of the prisoners could be reasonably referred. It is contended first that there was a fight between the parties and that the homicide should be referred to the anger aroused by mutual combat. It is true that when men fight upon a sudden quarrel, and one kills the other in the heat of passion aroused by the combat, the law ordinarily refers such a homicide to the anger and considers the killing a case of manslaughter. The doctrine, however, has this limitation: That the combatants must fight on equal terms, at least at the outset, and no unfair advantage must be taken.

In Russell on Crimes, p. 729, it is said: "Where the combat is not an act of deliberation, but the immediate consequence of sudden quarrel, it does not of course come within the foregoing doctrine, yet in cases of this kind, the law may come to the conclusion of malice if the party killing began the attack with circumstances of undue advantage; for, in order to save the party making the first assault upon an insufficient legal provocation from the guilt of murder, the occasion must not only be sudden, but the party assaulted must be put on an equal footing in point of defense, at least at the outset, and this more particularly where the attack is made with deadly and dangerous weapons."

Again, the same author says on page 731: "If after an interchange of blows on equal terms one of the parties on a sudden, and without any such intention at the commencement of the affray, snatches up a deadly weapon and kills the other party with it, such killing will be only manslaughter * * *. But if the party at the beginning prepared a deadly weapon and has at the time the power of using it in some

part of the contest, and uses it accordingly in the course of the combat and kills the other party with the weapon, such killing will be murder."

And *Bailey, J.,* in charging a jury, in an indictment for malicious cutting, said, among other things: "If persons meet originally on fair terms and after an interval, blows having been given, a party draws in the heat of blood a deadly instrument and inflicts a deadly injury, it is manslaughter only. But if a party enters in a contest, dangerously armed, and fights under an unfair advantage, though mutual blows pass, it is not manslaughter but murder."

Accordingly in *State v. Ellick,* 60 N. C., 450, we find it declared: "If, on a sudden quarrel, the parties fight by consent at the instant with deadly weapons and one is killed, it is but manslaughter, provided the parties fight on equal terms and no undue advantage is taken, for the fairness of the fight rebuts the implication of malice and the law mitigates the offense out of indulgence to the frailty of human nature." And, applying the principle it is there held, "That where words passed between the prisoner and the deceased who were sitting on a door sill, and the prisoner got up; the deceased then got up and reached his hand inside the door and got a stick, which was a deadly weapon, and as he was turning around with the stick the prisoner stabbed him with a bowie knife, it was held to be murder." To the same effect is *Price v. State,* 36 Miss., 531.

In several of the decisions establishing the limitation here stated, the weapon was concealed and mention is made of this fact. But the principle underlying the decisions seems to be that the party commenced the fight with a deadly weapon previously prepared and fought at an undue advantage.

The principle then, by which an unlawful and intentional homicide is under certain circumstances mitigated to manslaughter by reason of the anger aroused in mutual combat, has no application here. The prisoners armed with deadly

weapons commenced the fight on unequal terms, fought
throughout at undue advantage and killed without necessity.
Their conduct can receive but one construction: they intended
from the beginning of the combat that it should have a fatal
termination.   Again, it is urged that the prisoners are en-
titled to have this view presented: that the deceased caused
a final difficulty by making an assault on the Whites; that
he had acquiesced in their demand and all had become peace-
ful and quiet, when the deceased provoked a further alter-
cation by advancing on Chalmers White, was in the attitude
of striking him and that in the anger aroused by that assault
the deceased was slain.   But we do not think that any such
position is open to the prisoners in their testimony or that it
has support either in law or fact.   In the first place, there
was no such pause in this heartrending occurrence, which
permits its division into two altercations.   The whole affair
did not occupy five minutes of time.   Chalmers White testi-
fied (p. 54, record): "From the time we struck the porch
till he came down, I presume the whole time would be about
four or five minutes before he was lying on his back on the
floor dead."   Allowing a reasonable time for the deceased
to dress and come to the porch, the time consumed in this
fateful interview was indeed short.   When the deceased said
he would not marry their niece, he "did not love her," both
men drew and presented their pistols. The deceased then said
he would marry her. Thomas White then seems to have put
his pistol up, but this is left uncertain by the testimony.   His
evidence is as follows: "I read about where my shot hit him,
read about it.   He was then with his face towards my brother.
I could not have shot him in the back of his head from in·
front of him.   I do not know whether he had anything in his
hand or not.   I did say he was attacking my brother.   My
brother had a pistol; I do not know where he got it; when
he got up from the chair he assumed a threatening attitude;
we never put the pistols back in our pockets; had them in our

hands. We did not have the pistols drawn until he made the attack. We had them in our hands but did not have them covered on him. We had them in our hands for protection."

Q. And then you shot him not from what he had in his hand, but because he was attacking your brother. A. I saw there was a fight. I did not stop to see what kind of a fight.

Q. You shot him in the back of the head when you could have caught and held him. A. I could have caught him.

Q. Didn't you say you didn't want to hurt him; then why didn't you catch him and keep from hurting him—two great big men like you? A. Because he attacked us.

Q. You were mad, then? A. No, not mad.

Q. Not mad, and yet you preferred to shoot him in the back of the head instead of holding him? A. I shot him on account of the fight on hand; my brother was not struck at all; neither of us hit.

Q. And just for that, killed young Sherrill? A. Yes, I shot once, and I do not know how many times my brother shot."

But Chalmers White never put up his pistol till the fatal shots were fired. The deceased was then standing on his own porch, with one armed man on either side, and not allowed to withdraw from their presence even to go into his own door—one of the men, at least, keeping his pistol in evidence all of the time. There was never any pause in this scene, and not for one instant any change of attitude. Here again the conduct of the prisoners can receive but one reasonable construction, "Do what we demand and do it now, or your life is forfeited." Any inference, therefore, which depends upon the position that the deceased was the aggressor by bringing on a second altercation, in which he was killed, has no basis in fact and cannot be maintained. And if it were otherwise, if the deceased did bring on a second altercation, any assault he may have made, under the circumstances just stated, was entirely insufficient provocation to

mitigate this killing to manslaughter. The deceased had no knife, and neither of the prisoners says that he had. They do not swear that they thought so. There is nothing but a suggestion that he might have had one. Here is the testimony of Chalmers White: "I then turned and walked back to Sherrill and told him to come on and go with us. He then seemed very angry and began to advance and said, 'I will die first.' And as he said that he sprang towards us and forward, and I shot him. My brother fired, I think, about the same time. I do not know who shot first. We shot nearly at the same time. He was very near to me. I thought he was going to strike me with something when he advanced; he was in a striking attitude and an angry frame of mind. I think he was going to strike me because he was rushing on me and I thought I saw something. He could see that I was armed and I thought he was armed, and I did not think he would attack me unless he was. I could not see the knife in his hand. He could have had a knife or something, I could not see; it was a dark, cloudy morning." Again, this witness testified: "When he sprang up we both drew our pistols on him. I did not see any knife up to that time. I could not see what he had in his hand."

Q. Did you see anything in his hand? A. I could not tell what he had in his hand.

Q. Did you see the knife? A. He had his hand thrown back this way (striking attitude), drawn back as though to strike. I could not see what was in his hand.

Q. Was there anything in his hand? A. I did not know what he had in his hand. I thought there was something in his hand; I could not tell what it was.

Q. Couldn't you have seen the flashing of a knife blade as he drew back to strike? A. It was dark and cloudy. I could not see. He could have a knife and I could not have seen it.

138——46

Q. Will you swear he had anything in his hand? A. I thought he had something in his hand.

Q. Will you swear that he had a knife? A. He had something; I could not tell what it was.

Q. Was it long or short? A. I do not know. I can't tell whether it was long or short or anything about it; it was something.

Q. Was it black? A. I can't tell. I cannot describe what it was.

And Thomas White testified: "I had side-stepped and kept in a direct line with Sherrill, because I did not know what was going on at that time, nor what he was going to do. He continued to advance on my brother and drew back as if to strike. At the moment he did that, he sprang forward, and that put him just in front of me, or diagonally in front. I drew my pistol and we both fired about the same time. He had his hand in a striking position. I do not know whether he had a pistol or not. I could not see whether there was a knife in it or not."

The mother of the deceased said that the deceased never raised his hand except to ward off the pistol. But, put it as the prisoners claim and on the facts of this case as disclosed by the testimony, suppose he did raise his hand as if to strike and was shot down, both prisoners firing at the same time. This was no such provocation as the law deems adequate to reduce the grade of this offense.

In Clark on Criminal Law, p. 197, it is said: "Voluntary manslaughter is where the act causing death is committed in the heat of sudden passion caused by provocation. The provocation must be such as the law deems adequate to excite uncontrollable passion in the mind of a reasonable man. The act must be committed under and because of the passion." Again at page 198: "Intentional killing is manslaughter if it is committed under and by reason of a passion caused by what the law deems sufficient provocation. The law does

not merely look to see if a man was provoked and enraged, and, if so, reduce his crime to manslaughter; but it also looks at the provocation and does not excuse him at all if it was inadequate to excite his passion. The provocation must be sufficient in the eye of the law, or it is murder. Again, on pp. 203, 204: "In all cases the mode of resentment must bear a reasonable proportion to the provocation. A homicide is not reduced to manslaughter where a deadly weapon is used, unless the provocation was explicit.

To the same effect, *State v. Smith, supra; State v. Chavis,* 80 N. C., 353.

The suggestion that if there be a reasonable doubt as to which one fired the fatal shot, both must be acquitted, cannot be sustained. The prisoners may have gone to the house without any purpose to kill or do unlawful violence. They had a common purpose and when they drew their weapons they entered on that purpose unlawfully and were so manifestly acting together, one in the aid of the other, that a killing by either, under the facts of this case, would inculpate both.

The court is of opinion that there is no reversible error disclosed in the record and the judgment of the court below was correct.

No Error.