EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JUAN MÁRQUEZ ROSA y JOSÉ VÁZQUEZ ACOSTA, acusados y apelantes.

No. 4832.—*Sometido:* Abril 26, 1933. *Resuelto:* Julio 11, 1933.

334

F. *Rodríguez Alverio* y *V. M. Fernández,* abogados de los apelantes; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

Se trata de un proceso por mutilación. La acusación, en lo pertinente, dice:

"Los referidos Juan Márquez Rosa y José Vázquez Acosta el día 7 de junio de 1931, en la municipalidad de Las Piedras, dentro del Distrito Judicial de Humacao, P. R., ilegal, voluntaria y maliciosamente acometieron y agredieron al ser humano Rafael López de Victoria, Jr., infiriéndole golpes con un bate y un trozo de tabla sobre el ojo izquierdo, a consecuencia de cuyos golpes ha perdido totalmente y de modo permanente la visión por su ojo izquierdo el referido Rafael López de Victoria, Jr."

Contestaron los acusados alegando ser inocentes y solicitaron juicio por jurado. El juicio se celebró el 24 de marzo de 1932 rindiendo el jurado un veredicto de culpabilidad. Seis días después dictó sentencia la corte condenando a cada uno de los acusados a sufrir la pena de dos años de presidio con trabajos forzados. No conformes interpusieron el presente recurso de apelación.

La prueba de cargo consistió en las declaraciones del mutilado, del Doctor Bernabe, de un policía y de un testigo presencial. Tiende a demostrar que los acusados realizaron el acto delictivo. La de descargo, en las declaraciones de testigos que se hallaban en el lugar del suceso. Trata de demostrar que los acusados no agredieron al mutilado. El Jurado decidió el conflicto en contra de los acusados.

 Para sostener el recurso se alegan dos errores. Por el primero se impugnan las instrucciones de la corte al jurado por cinco motivos. Por el segundo se sostiene que el veredicto del jurado es contrario a derecho y a la prueba.

Antes de comenzar el estudio específico de las impugnaciones parece conveniente recordar que la regla es que cuando el acusado advierte algo objecionable en las instrucciones de la corte al jurado, debe llamarle la atención dándole así la oportunidad de corregirlas. De otra suerte sólo en casos de que envuelvan cuestiones fundamentales se prestará atención en apelación a dichas impugnaciones.

El primer motivo de impugnación consiste en que las palabras ''Si yo no he tenido culpa, ¿por qué me pega? si yo no he tenido culpa,'' puestas por el juez en boca del mutilado, y lo que sigue de sus instrucciones, a saber: ''el policía de servicio quien declaró haber advertido lo sucedido manifestó que vió a alguien que se puso frente al automóvil de López de Victoria y que al llegar al sitio donde ocurrieron los hechos vió allí a Juan Márquez Rosa; que Juan Márquez Rosa le dijo que no había pasado nada, que él no estaba agolpeado ni había agolpeado al señor Rafael López de Victoria,'' no está sostenido por la evidencia e influyó grandemente en el ánimo del jurado en perjuicio del acusado.

La evidencia aportada por el Pueblo fué, en resumen, como sigue:

Rafael López de Victoria Jr. declaró: Que el 7 de junio de 1931 guiaba su automóvil de pasajeros y ''llegando a Las Piedras, había un gran fuego . . . en la casa de los Mulero y no podían pasar los autos, y dí reversa . . . y me aguanté.''

El Policía Calderón le indicó que podía pasar caminando un poco ligero. Al hacerlo se atravesó un muchacho y por no matarlo desvió su carro, y cuando estaba sobre el guía pensando en si había herido al muchacho se presentó el acusado "don Juan Márquez Rosa. Me dió un cantazo por la espalda con un bate de jugar pelota . . . viré la cara con intenciones de tirarme y entonces volvió con el bate y me dió aquí . . . encima del ojo y me hundió esto. . . . Volvió y me tiró y cogió el guía y lo rompió y pasó a la parte delantera del carro y le tiró un golpe y bolló un guardalodo y se fué; . . . y entonces vino aquí este caballero, señalando al otro acusado Vázquez, con un canto de tabla . . . y me tiró y me dió aquí . . . en el mismo ojo con el canto de tabla . . ."

Dijo además que al desviar su carro parece que chocó con una mesa de Márquez. Explica que fué al hospital donde le hicieron la primera cura. El Dr. Pressly lo atendió cuatro días. Vino a San Juan donde el Doctor Bernabe que le prestó sus servicios. Nada ve por el ojo izquierdo. Antes de la agresión veía.

El Doctor Bernabe, oculista, declaró que asistió a López de Victoria que ha perdido totalmente su visión por el ojo izquierdo y que esa pérdida pudo deberse a un golpe que pudo causar una hemorragia intercerebral y esa hemorragia ocasionar la atrofia del nervio óptico y la consecutiva, o que pudo producir un traumatismo sobre el ojo por la fractura de la órbita y hacer presión sobre el nervio viniendo la atrofia consecutiva.

El Policía Calderón estaba de servicio en Las Piedras. Se refiere al incendio y a haber autorizado el paso del auto de López de Victoria recomendándole que lo hiciera ligero. Salió López y "después que había pasado del fuego, de una esquina salió un señor, un tal Otilio, no recuerdo el apellido, no era ninguno de los acusados, y al verlo López trató de parar y se desvió . . . el carro paró allí y estos dos señores ví que le dieron . . . a los pasajeros del carro, no ví a quién . . . Márquez tenía el bate . . . el palo José Vázquez . . .

López estaba sentado en el asiento del guía . . . tenía una herida sobre el ojo izquierdo . . lo llevé al hospital.''

A repreguntas de la defensa dijo que además de a Otilio, el carro de López arrolló al acusado Márquez cayendo éste al suelo presentando luego rasguños en una mano y en una pierna. Refiriéndose al acusado Vázquez manifestó que él mismo le había dicho que no le había dado el carro y que él nada le había hecho al *chauffeur*.

Por último Bartolomé Arroyo, uno de los que iba en el carro de López, declaró: ''Pues cuando íbamos saliendo de Las Piedras, el policía Calderón nos mandó a detener a consecuencia de un fuego que se estaba desarrollando en la tienda de los Mulero, y cuando el policía creyó conveniente, nos mandó a pasar, y el carro cuando fué a desarrollar, pues en ese mismo momento salió un señor de dentro del fuego para cruzar la carretera y el *chauffeur* por no pisarlo aguantó el carro y siempre lo llegó a alcanzar con el carro, y en ese momento el carro desvió hacia la izquierda y le dió a este señor que estaba sentado en una mesa con un bate en la mano, y en ese mismo momento el señor cogió el bate y le zumbó el palo.'' Señaló al acusado Márquez y refiriéndose a López continuó declarando: ''Estaba todavía en el carro, y este señor (señalando a José Vázquez) cogió una tabla y le dió también dos o tres cantazos al señor Rafael López de Victoria.'' Preguntado: ''¿El señor López de Victoria o alguno de ustedes atacó a estos señores o algo?'' Contestó: ''No, señor, López de Victoria lo que dijo fué: 'Yo no tengo culpa, por qué me dan tanto?' ''

Las declaraciones son mucho más amplias. Lo que hemos hecho es un mero resumen, procurando transcribir la exacta expresión del testigo. Puede verse de ellas que las palabras pronunciadas por el mutilado, equivalen a las que le atribuye el juez sentenciador, y que lo ocurrido en cuanto al otro extremo fué que el juez confundió los nombres de los acusados. Si en vez de referirse a Márquez lo hubiera hecho a Vázquez, se hubiera ajustado al dicho del policía. Y si se tiene en

cuenta que en las propias instrucciones el Juez refiriéndose a Márquez dijo: ''Parece que la mesa fué alcanzada por el automóvil al parar, al desviarse hacia la izquierda y Juan Márquez Rosa, o se cayó o fué alcanzado por el mismo automóvil;'' que la teoría de la defensa de ambos acusados fué la de negar en absoluto que hubieran realizado agresión alguna, y que no se llamó la atención a la corte en tiempo para que pudiera corregir la equivocación, deberá concluirse que no se trata de errores que puedan invocarse por primera vez en apelación y producir la revocación de la sentencia.

■ Además, el hecho de que López hubiera chocado con Márquez al tratar de evitar un accidente, no eximiría de responsabilidad a Márquez por haber agredido en la forma en que lo hizo a López. Pudo explicar la agresión y alegarse como una circunstancia atenuante a los efectos de la imposición de la pena, pero nunca servir de base para un veredicto absolutorio por parte del jurado.

■ El segundo motivo de impugnación se formula así:

''Dando instrucciones específicas al Jurado sobre el artículo 36 del Código Penal toda vez que la acusación no imputaba que los acusados 'actuaron conjuntamente' o bajo un 'designio común' y en ausencia de evidencia a ese extremo.''

Y el tercero, como sigue:

''Informando al Jurado que el veredicto a rendirse en este caso había de ajustarse a los siguientes principios: 'Si los señores del jurado entienden y creen que el día 7 de junio de 1931, en la municipalidad de Las Piedras dentro del Distrito Judicial de Humacao, P. R. ilegal, voluntaria y maliciosamente, Juan Márquez Rosa y José Vázquez Acosta, *actuando conjuntamente*, acometieron y agredieron al ser humano Rafael López de Victoria, hijo, infiriéndole golpes con un bate y un trozo de tabla sobre el ojo izquierdo, a consecuencia de cuyos golpes ha perdido totalmente y de modo permanente la visión por su ojo izquierdo, el referido Rafael López de Victoria, hijo, entonces los señores del Jurado deben declarar a los acusados culpables de un delito de mutilación que es el delito que se les imputa en esta acusación,' toda vez que esa instrucción no puede suplir la omisión fatal en la acusación de las palabras, *actuando*

*conjuntamente,* cuando se trata de dos acusados (Joinder of Parties)."

Dijo el juez en sus instrucciones:

"La Corte le llama la atención a los señores del Jurado, hacia el hecho de que están aquí acusadas dos personas. Si bien es verdad que uno de ellos solicitó originalmente, según los autos, que el juicio se celebrara separadamente, es lo cierto que después renunció a esa separación y solicitó ser juzgado conjuntamente en el caso.

"Según el artículo 36 de nuestro Código Penal, todas las personas complicadas en la comisión de un delito, ya cometieren el acto constitutivo del delito directamente, o ayudaren o instigaren a cometerlo, son principales o autores del delito cometido. Y cuando dos o más personas realizan juntos un acto criminal, unidos para realizarlo, ya sea mediante la física violencia de uno o de todos ellos, procediendo separada o colectivamente, cada individuo cuya voluntad ha contribuído a la realización del acto criminoso, ante los ojos de la ley es tan responsable por todas las consecuencias del acto realizado, como si lo hubiera realizado él solo."

Sigue entonces lo transcrito en el tercer motivo de impugnación. Y refiriéndose al delito imputado a los acusados antes había dicho:

"Como ustedes han visto por la acusación que acabo de leer, el delito que se imputa a los acusados es uno de MUTILACIÓN. Será reo del delito de mutilación, toda persona que de una manera ilegal, voluntaria y maliciosa, privare a algún ser humano de algún miembro de su cuerpo, o lo mutilare, desfigurare, o inutilizare, o le cortare, o le mutilare la lengua, o le sacare un ojo, o le sajare la nariz, una oreja o un labio. Éste es el texto casi literal, del artículo que en nuestro Código Penal define lo que es una mutilación.

"El Código Penal no requiere, para que el delito de mutilación se entienda cometido, que se pruebe una intención específica de mutilar, ya que toda persona responde de las consecuencias naturales de sus actos voluntarios y maliciosos. Tampoco necesita probarse que el perjudicado haya sido privado de un miembro importante de su cuerpo, pues cuando se priva a un ser humano de cualquier miembro de su cuerpo, sea o no sea importante, existe la mutilación. Para hacer más clara la instrucción: si una persona resulta mutilada por otra, es necesario que exista primero un acometimiento y agresión; el acometimiento es el acto de intentar el golpe; la agresión

es el acto de realizar o de inferir el golpe sobre la persona acometida; esto es el acometimiento y agresión.

"Ahora bien, no se necesita que la persona que acometa y realiza la agresión contra otra, tenga la intención deliberada de privarle de un miembro, o de mutilarle; si su agresión resulta en una mutilación es culpable de mutilación, aunque no haya tenido la intención de mutilar. Por ejemplo, un machetazo dado sobre un brazo, aunque no haya tenido quien lo dió la intención de cortar ese brazo, si a consecuencia de ese machetazo se desprendió el brazo del cuerpo, el delito cometido es una mutilación, porque se privó a un ser humano de un miembro de su cuerpo."

No creemos que se cometiera error fundamental alguno. Al discutir el señalamiento, admiten los acusados que si en la acusación se hubiera alegado que ellos "actuaron conjuntamente" la instrucción sería correcta. No era necesario. La acusación es bastante para que de ella se desprenda que se acusa a Márquez y a Vázquez como coautores o principales del hecho, responsables por igual.

En nuestro actual sistema todas las personas complicadas en la comisión de un crimen (artículo 36 del Código Penal) y que directamente cometieren el acto constitutivo del delito, o no hallándose presentes, hubieren aconsejado su comisión o incitado a ella; y todas las personas que aconsejaren o incitaren a menores de catorce años, lunáticos o idiotas a cometer algún crimen; o que, por medio de fraude, artificio, o violencia, ocasionaren la embriaguez de otra persona con el fin de hacerle cometer un crimen, son principales o autores en el crimen cometido. En él se califica de cómplices a los que en el sistema anterior se conocían como encubridores. El designio común o la actuación conjunta que tiene en mente la defensa, sólo se exige para determinados delitos como el de conspiración.

Además, si los acusados entendían que la acusación no era suficientemente concreta al no expresar qué participación tomó cada uno de ellos en la comisión del delito, debieron solicitar un pliego de particulares o pedir que se hiciera más

específica, y no lo hicieron. No se discuten ahora defectos en la acusación sino errores en las instrucciones.

■■ El cuarto motivo de impugnación es el de que la corte no expresó al jurado qué significaban las palabras ilegal, voluntaria y maliciosamente. Se invocan para sostenerlo dos casos, uno de Texas y otro de Louisiana.

El de Texas es el de *Bowers* v. *The State,* 24 Tex. A. 542, 549, y en él se dijo:

"Para que constituya el delito de mutilación, el acto debe haberse realizado voluntaria e ilegalmente. Un acto voluntario es aquél que se comete con intención maligna, con malicia legal, sin motivo razonable para creer que el acto está dentro de ley y sin justificación legal. Acto malicioso es uno cometido en aquel estado de la mente que demuestra un corazón que menosprecia los deberes sociales y fatalmente inclinado hacia la maldad; un acto ilegal realizado intencionalmente sin justificación o excusa legal.

"En juicios por este delito debe explicarse al jurado el significado legal de las palabras 'voluntaria' y 'maliciosamente'. (Willson's Texas Crim. Laws, secciones 876 y 877.) Creemos que en este caso se hizo esto substancial y suficientemente."

Y el de Louisiana es el de *State* v. *Cook,* 72 La. Ann. 85, 88. Se pidió la trasmisión de cierta instrucción. La corte sentenciadora se negó a ello, trasmitiendo la que preparó ella misma sobre el particular. Y dijo la Corte Suprema:

"La Ley 17 de 1888 enmienda el artículo 794 de los Estatutos Revisados haciéndole que lea: 'Toda persona que "voluntaria y maliciosamente," y con un arma peligrosa . . . inflija cualquier herida que no equivalga a mutilación,' etc. La enmienda consiste en la adición al estatuto original de las palabras 'voluntaria y maliciosamente.' La acusación en su segundo cargo imputa claramente una herida que no equivale a mutilación, de conformidad con la fraseología de la enmienda. Es por ende bastante claro que la instrucción dada al jurado fué pertinente y propia.

"La cuestión sobre la cual de acuerdo con la ley el juez estaba obligado a instruir al jurado fué el alcance y verdadero significado de la palabra maliciosamente según ella se usa en la ley que sirvió de base a la acusación, y a esta cuestión correspondió la instrucción por él dada.

"Era su deber hacerlo así y no más. Creemos que la corte inferior se negó acertadamente a instruir al jurado que a menos que se pruebe tal malicia que haga que el delito sea asesinato (en caso de sobrevenir la muerte) el acusado no puede ser convicto; ya que ello con toda probabilidad hubiese sido una instrucción que bien podría inducir a error, toda vez que este cargo de la acusación ni la ley imputaron ningún asesinato, ni tentativa o intención de asesinar. Y se ha resuelto frecuentemente que un juez debe negarse a instruir sobre una proposición abstracta de derecho que no tenga relación alguna con el caso que se ventila, ora esa proposición sea correcta o incorrecta. State vs. Riculfi and McClung, 35 An. 770; State vs. Garic, 35 An. 970; State vs. Hamilton, 35 An. 1043; State vs. Ford, 37 An. 443; State vs. Labuzan, 37 An. 489; State vs. Daly, 37 An. 576; State vs. Durr, 39 An. 751 (2 South. 546)."

No se nos ha citado precepto alguno de ley vigente en Puerto Rico que haga imperativo por parte de la corte explicar al jurado el alcance de las palabras que se indican. Los abogados de los acusados no pidieron a la corte que lo hiciera al dar sus instrucciones. Escucharon éstas y nada indicaron sobre el particular cuando el juez terminó. Bajo esas circunstancias no puede imputarse luego en apelación la comisión de error capaz de producir la revocación de la sentencia.

A la página 12, sección octava, del volumen 1 de la obra de Blashfield sobre Instrucciones al Jurado, se dice:

"Cuando términos legales o técnicos o términos que no son de uso común y que tienen un significado especial son usados en las instrucciones al jurado, la corte debe explicar o definir tales términos.

"En algunos estados por estatuto se requiere a la corte el dar y someter las explicaciones y definiciones de términos legales que sean necesarias, y hay algunas decisiones que expresan que es indispensable que términos legales y técnicos deban ser definidos y explicados especialmente cuando se solicitan instrucciones a ese efecto; pero como regla general, el dejar la corte de definir términos legales o de dar tales definiciones, no es un error a menos que la parte interesada haya solicitado una instrucción al efecto sin que se dé tal explicación o definición. Se ha resuelto repetidamente que el dejar de explicar en una instrucción palabras que tienen un significado técnico cuyo significado no es esencialmente diferente del que tienen

en el uso común, no puede ser fundamento para la revocación de una sentencia.''

Y luego en la página 19, se concluye que:

''No es necesario y, por tanto, no constituye error, el dejar de definir palabras del estatuto cuando estas palabras son palabras inglesas ordinaria y corrientemente y cuyas palabras son ordinaria y comúnmente entendidas por el pueblo en general.''

Aunque no puede negarse que aquí se trataba de palabras técnicas definidas por la misma ley—artículo 539 del Código Penal—es lo cierto que su significado ha llegado a ser tan conocido que bien puede sostenerse que son de conocimiento general.

El quinto y último motivo de impugnación a las instrucciones se formula así: No contienen ''instrucciones específicas al jurado sobre el delito de acometimiento y agresión grave y simple tratándose de un caso en que los acusados eran dos personas distintas que no habían actuado conjuntamente y la defensa por ellos establecida no fué defensa propia sino una negación de los hechos.''

Dice el artículo 286 del Código de Enjuiciamiento Criminal tal como quedó enmendado en 1913:

''Art. 286.—El jurado podrá declarar al acusado culpable de la comisión de cualquier delito necesariamente comprendido en el delito imputádole, o de tentativa de cometerlo.

''Bajo una acusación por el delito de mutilación, el jurado podrá declarar culpable al acusado de un delito de acometimiento y agresión con circunstancias agravantes, o de acometimiento y agresión simple, siempre que se hubiere probado en el juicio que el agredido no ha quedado inutilizado en algún miembro importante de su cuerpo.''

Atendido el resultado de la prueba de cargo y de la de descargo, el juez estuvo justificado en limitar sus instrucciones al delito de mutilación. Si el Jurado creía la prueba de descargo, debía absolver a los acusados; si daba crédito a la de cargo, debía condenarlos como autores de un delito de mutilación. El acusado Márquez acometió y agredió a

López sobre un ojo con un bate y el otro acusado Vázquez lo acometió y agredió sobre el mismo ojo con un pedazo de tabla. López quedó mutilado perdiendo la visión por dicho ojo. No es posible asegurar cuál de los dos golpes la produjo, pero sí que ambos pudieron separadamente producirla.

La situación hubiera sido distinta si Márquez hubiera agredido a López con la mano o en algún sitio diferente de su cuerpo y entonces Vázquez lo hubiera agredido con la tabla en el ojo, o si después de agredirlo Márquez en el ojo con el bate, Vázquez lo hubiera agredido con la mano o en algún otro sitio del cuerpo. El caso es semejante a dos personas que disparan sus armas de fuego contra otra a quien se hiere de muerte. Ambas serían igualmente responsables del homicidio perpetrado.

Por el segundo error se alega "que el veredicto rendido por el jurado es contrario a derecho y a la prueba." Todo cuanto dejamos expuesto demuestra la suficiencia de la prueba de cargo para sostener la sentencia. El Jurado le dió crédito. No así a la de descargo. Y como al resolver el conflicto no se ha demostrado que actuara influído por pasión, prejuicio o parcialidad o que cometiera algún error fundamental manifiesto, su veredicto, que sirvió de base a la sentencia condenatoria de la corte, debe quedar en pie.

*Procede declarar sin lugar la apelación y confirmar la sentencia recurrida.*