El Pueblo de Puerto Rico, demandante y apelado, *v.* Isidoro Santiago Rivera y Sergio Rivera Nieves, acusados y apelantes.

No. 5788.—*Sometido:* Enero 16, 1936. *Resuelto:* Marzo 13, 1936.

---

* Nota: Véase el prefacio.

*Tomás Acosta Ramis* y *J. Martínez Juliá,* abogados de los apelantes; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

El Fiscal del Distrito de San Juan formuló acusación contra Isidoro Santiago y Sergio Rivera imputándoles la comisión de un delito de asesinato cometido en febrero 12, 1934, en Río Piedras, al dar muerte ilegal con malicia premeditada al ser humano Cirilo Rivera.

Alegaron los acusados que eran inocentes y solicitaron juicio por jurado. Llamada la causa, practicada la prueba e instruído el jurado, rindió éste su veredicto declarándolos culpables de asesinato en primer grado, y la corte en su día los condenó a reclusión perpetua.

Apelaron para ante este tribunal. Sostienen que el veredicto y la sentencia son contrarios a las pruebas y a la ley.

■ Examinemos la evidencia.

Declararon por El Pueblo el Doctor Basilio Dávila, Víctor de la Paz, Carmen María Castro, Luis de la Paz, Inocencio Delgado, Francisco Orosco, Isaac Vélez, José Calderón Miró y José Manuel Ortiz, y por la defensa los propios acusados y Enrique Ledesma.

El doctor practicó la autopsia al cadáver de Cirilo Rivera, hombre como de cuarenta años de edad, robusto. Presentaba una herida de un extremo a otro de la mano derecha, seccionando los tendones y llegando hasta el hueso, otra en el codo derecho como de una pulgada pero profunda, otra en la espalda debajo del omoplató derecho y otra también en la espalda por debajo de la duodécima costilla que penetró en la cavidad abdominal hiriendo el páncreas que produjo la

hemorragia determinante de la muerte. A preguntas de la defensa contestó que la herida de la mano pudo ser producida con un machete y las de la espalda con un cuchillo, y que el interfecto era más fuerte físicamente que cualquiera de los acusados.

El testigo Víctor de la Paz declaró que por encargo del acusado Isidoro Santiago fué a buscar una leña y la llevó a su casa en la que se presentó Cirilo Rivera, el interfecto, diciendo que la leña era suya por haberla comprado en medio peso a Ledesma y se fué. Llegó entonces Santiago y le dijo: "Vete donde Cirilo y dile que venga acá." Fué y al llegar Cirilo "Santiago le tiró en seguida con un machete y al momento le tiró Sergio (el otro acusado) con un cuchillo." Santiago le tiraba de frente. Sergio por detrás.

Carmen María Castro, describe los hechos como sigue: "Me encontré en el centro de mi casa y yo siento los gritos y al sentir los gritos que le decía: 'Ay, no me mates' yo me asomé por la ventana y vi que el señor Isidoro Santiago le dió una herida con un machete al señor Cirilo y vino el señor Sergio y le dió una puñalada por detrás y no oí nada más y me tiré a la calle." Y Bernardo de la Paz, así: "Vi al señor Cirilo lleno de sangre y vi al señor Lolo alante con un machete, con un mocho y al señor Sergio con un cuchillo por detrás. Uno le tiraba por detrás y otro por delante."

Inocencio Delgado expresó: "Ese día yo estaba en una esquina cuando oí los gritos y voy para allá y cuando ya llegando al ranchón vi a Cirilo que venía andando para atrás, tapándose y venía Isidoro con un machete tirándole de frente y venía para atrás y yo lo vi que venía cortado y entonces vi a Sergio con el cuchillo levantado así."

Francisco Orosco dijo: "Estando yo parado en la calle vi venir a Isidoro Santiago con un machete tirándole a Cirilo de frente y Sergio Rivera con un cuchillo tirándole", y contestó a un jurado como sigue:

"P.—¿Y Cirilo qué hacía?—R.—Huyendo para atrás.—P.—¿Se tapaba?—R.—Sí, señor.—P.—¿Con qué se tapaba?—R.—Con las ma-

nos.—P.—¿A qué distancia estaba el testigo del sitio del suceso?—R.—Como a 20 metros.''

Isaac Vélez depuso: ''El día a que se refiere el crimen se hallaba Cirilo Rivera jugando dómino en el kiosko que yo tengo y fué Víctor de la Paz y lo llamó y le dice: 'Cirilo, Cirilo, dice Isidoro—Lolo, llamado Isidoro Santiago—que vaya allá' y el muchacho se fué y momentos después me dice: 'Voy a ir allá' y se fué y cuatro minutos más o menos de haber salido de allí, oí un alboroto y me asomo a la calle y lo llevaban ya herido para el Hospital.''

José Calderón Miró, dueño de la planta de hielo de Río Piedras, declaró que tenía empleado a Cirilo Rivera y lo conoció por veinte años como hombre trabajador y cumplidor de sus deberes, pacífico.

Con esa declaración terminó la prueba de cargo. Fué a la silla testifical el acusado Santiago y dijo:

''Allí lo que ocurrió el día 12 de febrero fué que yo estando atendiendo mi venta en la plaza del mercado, el señor Ledesma me mandó a buscar con Víctor de la Paz para que fuera a buscar una leña a la casa y entonces fuí donde el señor Ledesma a comprar la leña. Fuí y traté la leña . . . y entonces le dije: 'Víctor, ve a casa, coge el carrito y me llevas la leña a casa. . . . Me quedé atendiendo la venta en la plaza del mercado de Río Piedras. Al poco rato llegó Víctor de la Paz a donde yo estaba y me dice: 'Isidoro, que vayas allá, que allí está Cirilo Rivera armado allí en la casa.' . . . fuí para casa y estando el señor Cirilo frente a la puerta de mi casa . . . Me dijo: 'Que esa leña es mía y me la voy a llevar' y le dije: 'Ten en cuenta que esa leña se la acabo de comprar a Ledesma ahora.' . . . Cuando yo le dije: 'ten en cuenta que esa leña se la compré a Ledesma hará poco', me dijo: 'Yo no tengo que ver con Ledesma ni ocho cuartos, es mía y me la voy a llevar.' Yo tenía un pie en el escalón y otro abajo y entonces trató de tirárseme encima y como era un hombre de más cuerpo que yo . . . . Subí arriba y en la puerta de mi casa encontré un mocho y yo traté de defenderme con él. . . . Yo como quería entrar a mi casa le tiré con el mocho . . . y cuando yo le tiré él se agarró conmigo. . . . Cuando yo sentí una voz que dijo: 'Qué pasa? . . . yo brinqué arriba. . . . Cirilo Rivera se emborujó con Sergio Rivera. . . . Yo no sé si lo herí porque yo le tiré de azote cuando él se me tiró encima.''

Declaró también el otro acusado Sergio Rivera, como sigue: Se dedicaba a vender por el pueblo alimentos de cerdo del otro acusado Santiago que llevaba en una ponchera, usando un cuchillo para la venta al detalle. Cuando llegó encontró "emborujados" a Santiago y Cirilo. Preguntó qué pasaba y Cirilo soltó a Santiago y se le tiró encima a quitarle el cuchillo para cortar a Santiago. Hubo una lucha. Cayó al suelo e hirió con el cuchillo a Cirilo por las costillas.

Enrique Ledesma manifestó que había vendido madera procedente de una casa vieja que tenía que derribar al acusado Santiago en veinte centavos y se la entregó al muchacho Víctor de la Paz. Siguió tras él y al pasar por frente a la tienda de Pedro Rodríguez donde estaba Cirilo Rivera, el interfecto, oyó cuando éste dijo al muchacho "Te doy un peso cincuenta centavos por esa leña" contestándole Víctor "Esa madera es de Lolo y no puedo venderla."

El fiscal llamó entonces a declarar a José Manuel Ortiz de diez años de edad, hijastro del interfecto. Dijo que iba con su papá y "Ledesma le dijo que le vendía la madera a papá y papá le dijo que en cuánto se la vendía y Ledesma le dijo que $1.00 y papá le dijo que 50¢ y le dijo: 'bueno cógela en 50¢' y papá cogió el medio peso y se lo dió."

Tal fué, en resumen, la prueba que sirvió de base al jurado para dictar su veredicto.

Isidoro Santiago por medio de sus abogados sostiene que no es suficiente para condenarlo como autor de la muerte de Cirilo Rivera porque sólo demuestra a lo sumo que él le causó la herida de la mano que no fué la que le ocasionó la muerte, sin que actuara en combinación con el otro acusado Sergio Rivera.

Su teoría es que habiendo actuado los dos acusados independientemente, sin que se pusieran de acuerdo para matar a Cirilo Rivera, cada uno de ellos es responsable solamente de lo que hizo. Cita en apoyo de la misma 12 A.L.R. 280; *Givens* v. *State,* 62 So. 1021; *Scott* v. *State,* 163 Pac. 553;

*State* v. *Reedy*, 127 S.E. 27 y *El Pueblo* v. *Alvarez*, 37 D.P.R. 579.

No estamos conformes. No se acusó a los apelantes como autores de una conspiración sino como coautores de un asesinato, de acuerdo con el artículo 36 del Código Penal.

En el caso de *Pueblo* v. *Márquez y Vázquez*, 45 D.P.R. 333, en que ambos fueron acusados y condenados por mutilación, esta corte dijo:

"No creemos que se cometiera error fundamental alguno. Al discutir el señalamiento, admiten los acusados que si en la acusación se hubiera alegado que ellos 'actuaron conjuntamente' la instrucción sería correcta. No era necesario. La acusación es bastante para que de ella se desprenda que se acusa a Márquez y a Vázquez como coautores o principales del hecho, responsables por igual.

"En nuestro actual sistema todas las personas complicadas en la comisión de un crimen (artículo 36 del Código Penal) y que directamente cometieren el acto constitutivo del delito, o no hallándose presentes, hubieren aconsejado su comisión o incitado a ella; y todas las personas que aconsejaren o incitaren a menores de catorce años, lunáticos o idiotas a cometer algún crimen; o que, por medio de fraude, artificio, o violencia, ocasionaren la embriaguez de otra persona con el fin de hacerle cometer un crimen, son principales o autores en el crimen cometido. En él se califica de cómplices a los que en el sistema anterior se conocían como encubridores. El designio común o la actuación conjunta que tiene en mente la defensa, sólo se exige para determinados delitos como el de conspiración."

Y en el caso de *McCoy* v. *State*, 44 So. 814, la Corte Suprema de Mississippi se expresó como sigue:

"Pero llegando a la conclusión específica que el ilustrado abogado de la defensa en ambos casos presenta, encontramos que en último análisis es la siguiente: Que nada de lo que hizo Jack Douglas al tiempo de la muerte, ha debido permitirse que fuera al jurado contra Henry McCoy en el juicio por separado de éste y que nada de lo que hizo Henry McCoy al momento del delito debió haberse permitido que fuera al jurado contra Jack Douglas en el juicio separado de éste, por la razón de que no se ha demostrado que existiera conspiración o confabulación entre ellos. Esta es la primera parte de la contención del acusado y apelante. Y segundo, que a menos que la prueba demuestre que hubo tal conspiración, El Pueblo debe

ser requerido a que demuestre por prueba, antes de que ninguno de ellos pueda ser convicto, que ése de ellos fué el que produjo la muerte. Nosotros expresamos ahora, en primer lugar, como contestación a la primera parte de la contención del acusado y apelante, que todo lo que fuera hecho por cualquiera de ellos en el momento en que ellos se encontraban sobre el interfecto, ambos atacándolo e hiriéndolo con instrumentos afilados, era prueba competente como parte·del *res gestae*. El caso de Purplus vs. State, 84 Miss. 49, citado por el acusado apelante, no es aplicable al de autos. El ilustrado abogado del acusado y apelante equivoca el verdadero propósito de aquel caso. Las partes en aquel caso que tenían bastones en sus manos, no tuvieron nada que ver con la muerte, ni participaron en la muerte en ningún modo ni forma. Ellos eran meros espectadores. En el caso de autos ambos coacusados estaban sobre el interfecto y ambos lo herían repetidamente con algún instrumento afilado que manifiestamente produjo la muerte. Decidir en un caso como éste que lo que fué hecho por uno no podía ser admitido como prueba en el juicio contra el otro, sería equivalente a decidir que en un caso semejante ninguno de los dos podría ser convicto de asesinato en absoluto en ausencia de prueba de una conspiración o confabulación. Decir eso, es claramente demostrar un patente absurdo. En 12 Cyc. 437, se dice: 'Las manifestaciones y actos de cualquier participante en un crimen que estaba presente cuando se cometió, son competentes y admisibles contra todos los allí presentes. Se ha dicho algunas veces que declaraciones hechas bajo tales circunstancias son admisibles contra el acusado, por ser manifestaciones de un coconspirador; pero el verdadero fundamento de la regla es que tales declaraciones hechas por uno, son admisibles contra el otro, por razón de formar parte del *res gestae*. Esa es incuestionablemente la verdadera base y fundamento para la admisibilidad de tales declaraciones.

"Pasando ahora a la segunda parte de la contención del acusado y apelante, o sea, que ninguno de los acusados puede ser declarado culpable ni aún de homicidio a menos que El Pueblo demuestre, fuera de toda duda razonable, por medio de prueba que tal específico acusado asestó el golpe fatal, expresamos, primero, que estamos perfectamente satisfechos que el jurado hubiera estado justificado al declarar, de acuerdo con la prueba de este caso, que ambos de estos acusados infligieron las heridas fatales; pero aparte del derecho del jurado para así declararlo, debemos expresar que no es la ley como la expresa el acusado y apelante, o sea, que ninguno podía ser convicto a menos que el estado demostrara que él por su acto independiente, realizó la muerte. Estos acusados estaban manifiestamente

ayudándose y auxiliándose, uno a otro, en la comisión de este homicidio, ambos sobre el interfecto al mismo tiempo, ambos persiguiéndole durante algún trayecto al mismo tiempo, ambos saltando sobre él, juntos, e hiriéndole al mismo tiempo, hasta que habiendo sido levantado el interfecto. por William Mack, lo dejaron. Ante tales hechos debe seguir la conclusión de la misma manera que la noche sigue al día, que cada uno de los acusados vió al otro, que cada uno de ellos sabía que el otro estaba tratando de matar al interfecto; que cada uno de ellos agredió con la tendencia de realizar el propósito común de matarlo, y si fué uno o fué el otro el que mató, ambos son culpables como principales bajo nuestro estatuto, habiendo ayudado y auxiliado cada uno el acto del otro.

"Estos principios que así expresamos, están abundantemente respaldados por las autoridades. En el caso muy similar de State vs. White, 138 N. C. 723, 51 S. E. 50, donde dos hermanos habían disparado al mismo tiempo y matado a una tercera persona y donde se hizo el mismo argumento que se hace ahora en el caso de autos, la corte se expresó así: 'La alegación de que si existe una duda razonable acerca de cuál disparó el tiro fatal, ambos deben ser absueltos, no puede ser sostenida. Estas personas pueden haber ido a la casa sin ningún propósito de matar o de realizar alguna violencia ilegal. Ellos tenían un propósito común y cuando sacaron sus armas, entraron de lleno en la realización de aquel propósito ilegal y estaban tan manifiestamente actuando juntos, uno en ayuda del otro, que una muerte realizada por cualquiera de los dos bajo tales circunstancias, los inculparía igualmente a los dos.' Este es precisamente el principio que cubre el caso de autos. En el caso de Regina v. Price, donde seis hombres asaltaron a otro y uno de los seis infirió una herida y mató a la persona asaltada y fueron acusados conjuntamente por asesinato, se decidió: primero, que el que infirió la herida era culpable de asesinato, hubiera intentado matar o no; segundo, que los otros cinco eran culpables de asesinato si participaron en el propósito común de matar; tercero, si no hubo propósito común de matar, pero el cuchillo fué usado siguiendo un propósito común de usarlo, todos serían culpables de asesinato; cuarto, que si no hubo propósito común de usar el cuchillo y estando presentes al momento de producirse las heridas ellos asintieron y manifestaron su asentimiento por medio de su asistencia en el crimen, ellos eran culpables de asesinato.' Lo resuelto en los puntos tercero y cuarto, es perfectamente aplicable al caso de autos. A ese mismo efecto, puede verse State vs. Prater, 43 S. E. 230; Vasser vs. State, 87 S. W. 635. En Wharton on Homicide, (3ª. ed.) páginas 49 y 50, se dice: 'Toda persona

presente, consintiendo a la cómisión de un delito y llevando a cabo algún acto que es un ingrediente de ese delito, o que esté inmediatamente conectado con él o ayudando a su comisión es tanto un principal como si hubiera con sus propias manos cometido todo el delito.' 'Ayudar en la comisión de un homicidio convierte al que ayuda en un principal. Para convertir a una persona en criminalmente responsable como principal de una muerte, no es necesario que ella haya asestado el golpe mortal. Es suficiente que haya estado presente llevando a cabo algún acto o auxiliando en el acto; y esto es así aún cuando no haya habido designio común o previo acuerdo para matar o causar daño.' ''

Las autoridades que los apelantes citan no sostienen su teoría aplicada a los hechos de este caso. Aunque se admitiera que la única herida que causara el acusado Santiago fuera la de la mano, la prueba de cargo que fué la que creyó el jurado demuestra que Santiago armado de un machete esperó al interfecto y lo acometió en seguida hiriéndolo y seguía aún acometiéndolo cuando se le acercó el otro acusado y le asestó por la espalda el golpe fatal. No es necesario el previo acuerdo. Surgió la unidad en la dañada intención de ambos acusados en el momento mismo de la comisión del delito. Lo que hizo Sergio Rivera fué sumarse al acto criminal iniciado por Santiago. Del asesinato perpetrado son responsables ambos.

En cuanto a Sergio Rivera sostienen sus abogados que el veredicto es contrario a la prueba y a derecho porque de la prueba no se desprende que existiera premeditación ni deliberación.

Tampoco estamos conformes. Cuando el acusado llegó, de acuerdo con la evidencia que creyó el jurado, encontró al otro acusado armado de un machete acometiendo al interfecto que aunque físicamente más fuerte estaba desarmado y retrocedía, ¿y qué hizo? Calladamente le clavó su cuchillo por la espalda y lo mató. Rápido fué su acto pero deliberado y alevoso, reuniendo así los elementos constitutivos del delito por el cual fué acusado y castigado.

Lo que aquí resolvemos no es contrario por supuesto al

poder que tiene el jurado para declarar en propios casos a varias personas acusadas de asesinato a alguna o a algunas culpables de asesinato en primero o en segundo grado y a otra o a otras culpables de homicidio, de acuerdo con la doctrina expuesta y establecida en el caso de *El Pueblo* v. *Marrero,* 48 D.P.R. 896, 912.

*Debe declararse sin lugar el recurso y confirmarse la sentencia apelada.*

El Juez Asociado Señor Córdova Dávila no intervino.